IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

HUMANSCALE CORPORATION

      PLAINTIFF,

  v.

MASS ENGINEERED DESIGN, INC., ET AL.

      DEFENDANTS.

C.A. No. 1:13-cv-535-CMH-IDD

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I. INTRODUCTION…………………………………………………………………...1

II. LEGAL FRAMEWORK……………………………………………………………..2

III.   HIGH LEVEL INTRODUCTION TO
       THE GENERAL TECHNOLOGY AT ISSUE……………………………………....2

IV. CONSTRUCTION OF THE DISPUTED CLAIM TERMS……………………………...3

   A. Arm………………………………………………………………………….....3

   B. Base/base member/base structure……………………………………………….6

   C. Each of the first computer display and the second computer display is capable
   of being more vertical than horizontal………………………………………..…..8

   D. extendable from a retracted configuration
   to an extended configuration………………………………………………….…10

   F. means for adjusting the angular orientation
   of each of the displays relative to the arm assembly
   to thereby permit said displays to be angled
   toward each other to a desired degree…………………………………………...11

   G. means for adjusting the angular orientation of each
   of the display relative to the arm assembly about a generally
   vertical axis to thereby permit said displays to be angled
   relative to each other to a desired degree…………………………………….…14

   H. mounting means for mounting the displays to the arm assembly………………..15

   I. mounting member……………………………………………………………16

   J. positioning means for positioning displays………………………………………17

   K. rest[ing] on a...surface………………………………………………………19

   L. resting on a counter…………………………………………………………19

   M. stand[ing] on [a/the] ... surface……………………………………………20

   N. support arm structure [having a single piece support arm]……………………...22

**O. support means for supporting the arm assembly from the base member**………..24

**P. support means having a base for supporting
the arm assembly above a support surface**…………………………………………………**26**

**Q. support surface**……………………………………………………………………………**26**

**R. the ends are oriented vertically**…………………………………………………...**27**

**S. Agreed terms needing correction**…………………………………………………...**29**

**T. Other agreed terms**………………………………………………………………………**29**

**V. CONCLUSION**………………………………………...…………………………………...**30**

## TABLE OF AUTHORITIES

### *Cases*

*Acromed Corp. v. Sofamor Danek Group,* 253 F.3d 1371 (Fed. Cir. 2001)……………………13

*British Tel. PLC v. Prodigy Commc'n Corp.*, 189 F. Supp. 2d 101 (S.D.N.Y. 2002)………………18

*Cole v. Kimberly-Clark Corp.,* 102 F.3d 524 (Fed. Cir. 1996)…………………………………19

*Diagnostics Corp. v. Elekta AB,* , 344 F.3d 1205 (Fed. Cir. 2003)…………………………………2

*Group One v. Hallmark Cards,* 407 F.3d 1297 (Fed.Cir.2005)…………………………………...29

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004)……………….....18

*Mass Engineered Design, Inc., et al. v. Ergotron, Inc., et al.*, C.A. No. 2:06-cv-0272……1, 12, 14

*NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062 (Fed. Cir. 2002)…………………17

*Novo Industries v. Micro Molds*, 350 F.3d 1348 (Fed.Cir.2003)…………………………………29

*O2 Micro Int'l v. Beyond Innovation Technologies*, 521 F.3d 1361 (Fed.Cir.2008)………….20, 28

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)………………………20, 28

*Personalized Media Communications, L.L.C. v. Int'l Trade Comm'n,*
161 F.3d 696 (Fed. Cir. 1998)……………………………………………………..…………19

*Phillips v. AWH,* 415 F.3d 1303 (Fed. Cir. 2005)…………………………………...2, 17, 20, 28

*Sage Prods. v. Devon Indus., Inc.,* 126 F.3d 1420 (Fed. Cir. 1997)……………………………19

*Searfos v. Pioneer Consolidated Corp.,* 374 F.3d 1142 (Fed. Cir. 2004)………………………19

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)……………………...20, 28

*TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126 (Fed. Cir. 2004)………...…18

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001)………....13

*York Prods., Inc. v. Central Tractor Farm & Family Center,*
99 F.3d 1568 (Fed. Cir. 1996)…………………………………………………………...18-19

***Statutes***

35 U.S.C. § 112(6)……………………………………………………………………2, 11, 15

I.    **INTRODUCTION**

The patents-in-suit are U.S. Patent Nos. RE36,978, entitled "Dual Display System" (the "'978 patent)(Exhibit 1), which issued in 2000; RE42,091, entitled "Computer Display Screen System and Adjustable Screen Mount, and Swinging Screens Therefor" (the '091 patent)(Exhibit 2), which issued in 2011; 8,102,331, entitled "Horizontal Three Screen LCD Display System" (the "'331 patent")(Exhibit 3), which issued in 2013; and 8,462,103, entitled "Computer Display Screen System and Adjustable Screen Mount, and Swinging Screens Therefor" (the "'103 patent")(Exhibit 4), which issued in June of this year. At a high level, the patents-in-suit generally relate to various novel display apparatuses for systems comprising multiple computer monitors. Jerry Moscovitch is the sole listed inventor on the '978 and '331 patents, and he is the first listed inventor on the '091 and '103 patents. Mr. Moscovitch is also the president of MASS Engineered Design, Inc. (collectively they are referred to herein as "MASS"), and MASS is the exclusive licensee of the patents-in-suit. In this proceeding, MASS contends that Humanscale infringes multiple claims of the patents-in-suit.[1]

Prior Related Case

On July 7, 2006, MASS filed suit against Ergotron and others in Texas for infringement of the '978 Patent (the "Texas Case"). The Texas case was styled *MASS Engineered Design, Inc., et al. v. Ergotron, Inc., et al*., C.A. No. 2:06-cv-0272. Ultimately, the case went to trial and a jury found in favor of MASS. Of particular relevance here is that the court in the Texas Case construed many of the terms of the '978 Patent, including issuing three separate claim construction opinions. Those opinions are attached hereto as Exhibits 4-6. While this Court is not bound by the Texas Court's claim constructions, the Texas Court's findings and analysis is

---

[1] MASS contends that Humanscale infringes claims 16,17,18,19,20, 21, 22, 23, 24,25,26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37 of the '978 patent; claims 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 30 of the '091 patent; claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 16, 17, 18 of the '331 patent, and claims 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 of the '103 patent.

instructive, including because the court considered and rejected many of the meritless arguments that Humanscale makes here in support of its erroneous and/or improper claim constructions.

## II.      LEGAL FRAMEWORK

This Court has substantial experience with patent infringement cases and it need not be educated on the basics of claim construction. In general, the Federal Circuit's en banc decision in the *Philips* case provides the basic legal framework. see *Phillips v. AWH,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).) As to the means-plus-function ("MPF") claims at issue in this case, *see* 35 U.S.C. § 112(6), their MPF elements cover the structure disclosed in the specification that performs and is clearly linked to the claimed function. *See, e.g., Diagnostics Corp. v. Elekta AB,* , 344 F.3d 1205 (Fed. Cir. 2003).

## III.     HIGH LEVEL INTRODUCTION TO THE GENERAL TECHNOLOGY AT ISSUE

Figures 1, 2 and 4 of the '978 patent show front, side and top level views of one embodiment of multi-monitor display system, as follows:



Here, "display system 10" includes a "base 12," a pair of "displays 14, 16" mounted on "arm 18," and "upright 20" which associated with the "base 12" supports the "arm 18." 978/2:22-27.[2]

At a high level, and pertinent to the claims at issue in this proceeding, the '978 patent is generally directed to a display system comprising a base member, a pair of electronic displays; positioning means for positioning the displays, the positioning means comprising an arm assembly; support means for supporting the arm assembly from the base member; and mounting

---

[2] "978/2:22-27" refers to the '978 Patent, column 2 at lines 22-27.  This citation format will be used throughout Mass's brief to cite to the patents-in-suit.

means for mounting the displays to the arm assembly, the mounting means comprising means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree. *See, e.g.,* '978 patent, claim 16.

At a high level, and pertinent to the claims at issue in this proceeding, the '091 patent is generally directed to a modularly configurable display system comprising a base structure; three or more detachable support arms, and coupling assemblies for securing display panels from the support arms.

At a high level, and pertinent to the claims at issue in this proceeding, the '331 patent is generally directed to a display system comprising a base, a support column, a support arm structure secured to the support column, and connectors for connecting display housing portions at the backs of displays to the support arm, such that at least a part of the support column is disposed behind the displays, wherein the support arm is bowed at the front.

At a high level, and pertinent to the claims at issue in this proceeding, the '103 patent is generally directed to a computer display support structure comprising a support member having a base, a column, an arm assembly, and mounting assembly for mounting the computer displays in various positions, including where the first and second displays are viewable from opposite sides and where the arm assembly is in retracted and extended configurations.

## IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS

| A.   Arm[3] | |
|---|---|
| **MASS:** an elongate structure connected to and projecting from another structure | **Humanscale:** part similar to a human arm, such as the projection from a central support in a machine |

The term "arm" has well understood meaning in the context of the '978, '091, '103 and '331 Patents. An arm is an elongate structure connected to and projecting from another structure.

---

[3] '978 patent claims 16-18,20-23,25-28,31-33,35-38; ("arm" assembly); '091 patent claims 5, 9, 12-14, 16-17, 20, 23-25; (support "arm"); and '331 patent claims 1, 5-6, 8-12, 14-18; '103 patent claims 1, 3-4, 7, 9,10, 12,15-16. (support "arm").

The use of this term throughout the claims of the patents-in-suit is consistent, and claim 16 of the '978 patent is representative, wherein the positioning means includes an "arm" assembly for supporting the displays. Similarly, claim 5 of the '091 Patent and claim 1 of the '331 Patent require a support "arm." Further, the specifications of the patents-in-suit provide examples of an arm. For example, Fig. 19 of the '978 Patent shows an arm 162 that when connected to upright



158 projects therefrom: .

Another example is Fig. 53 of the '091 Patent that shows multiple arms ARM 1, ARM 2 and ARM 3. ARM 1 is connected to and projects from the column, whereas both ARM 2 and



ARM 3 are connected to and project from ARM 1: . The '331 Patent also describes (*e.g*., in Fig. 3), a horizontal support arm 26 which may be connected to a vertical support column 24:



The '978, '091, '331 and '103 patents are consistent in describing an arm as an elongate structure connected to and projecting from another structure.

Humanscale's proposed construction, which includes the phrase "a part like a human arm" is improperly narrow, including because a human arm projects from only one side of the torso, whereas in the patents-in-suit, arms may project from both sides of a structure to which the arm is connected. For example, in Figures 1-6 of the '978 patent, element 18, which is referred to as an "arm" (*see, e.g.*, 978/3:20-44), projects from *both* sides of the central upright 20. Other examples from the patents in suit where an arm projects from both sides of a structure include arm 162 (Fig. 18 of the '978 patent), arm 20 (Fig. 4 of the '103 patent), arm 308 (Fig. 53 of the '103 patent) and arm 26 (Fig. 2 of the '331 patent). In other instances in the patents-in-suit, an arm does extend from just one side of a structure, such as arm 110 or arm 112 in the '978 patent, and upright arm 96 (Fig. 18 of the '103 patent). This demonstrates that the term arm, as used in the context of the patents-in-suit, is broader than "a part similar to a human arm." This reason alone is sufficient to reject Humanscale's definition of arm.

In addition, Humanscale's unduly restrictive construction adds no clarity to an easily understood term and, in fact, only departs from the meaning of "arm" as understood in the context of the '978, '091, '103 and '331 patents. For instance, Humanscale provides no explanation of how "similar" to a human arm the patented invention must be. For instance, must a structure have an elbow, wrist and fingers to be "similar to a human arm"? Humanscale's proposed construction adds no clarity in this regard. Similarly, there is no explanation or context of what a "projection from a central support in a machine" means. Depending on the type of machine and what constitutes its central support, "arm" could have a myriad of disparate and non-relevant meanings.

5

| B. | base/base member/base structure |
|---|---|
| MASS: the lowermost portion of the system that engages a surface and that supports the arm assembly (978, 103), arms (091) or support arm structure (331) above the surface | Humanscale: the lowermost portion of the system for resting on a work surface and that supports the arm assembly (978, 103), arms (091) or  support arm structure (331) above the work surface |

Consistent with its use in the specification and the claims, the terms base, base member and base structure (which the parties agree should all have the same construction and will be referred to herein collectively as "base") mean the lowermost portion of the system that engages a surface and that supports the arm assembly ('978, '103), arms ('091) or support arm structure ('331) above the surface.  *See, e.g.,* '978/1:34-39; 2:24-27, 3:23-26, and Claims 1, 16 and 17; '091/1:44-50, 6:10-14, 5:43-45, 12:61-62, and Claims 1, 5, 9, 12, 20 and 25; '331/3:11-12 and Claims 1 and 9; and '103/1:38-43, 5:29-31, 8:54-59, 14:31-34, 17:17-21 and Claim 1. Exemplary of this are base 12, 102 and 156 depicted in Figures 1-6 and 12 -18 and described in the specification of the '978 patent; bases 24, 88, 92, 192, 214, 302  depicted in Figures 1-5, 13, 15, 18 -19A, 44-49, 51-64 and described in the specification of the '091 patent; base 22 depicted in Figures 1-5 and described in the specification of the '331 patent; and bases 24,  88,  92,  182, 214,  302,  402,  502  and  802 depicted in Figures 1-5, 13, 15, 18-19, 44-47, 51-71, 73, 76, 79-81 and described in the specification of the '103 patent.  The parties thus agree that a "base" is "the lowermost portion of the system … that supports the arm assembly (978, 103), arms (091) or support arm structure (331) above the … surface."  However, there are two disagreements.

The first dispute to be resolved is Humanscale's erroneous position a base requires a "work surface."  This argument was rejected by the Texas Court when it construed "base" (vis-à-vis the '978 patent only) as supporting arms above a "surface."  The '331 patent is the only one of the four that refers to a "work surface" in the specification.  The '978 patent describes, depicts and claims that embodiments of a base disposed on a "horizontal surface." *See, e.g.,* '978/3:20-22 and Claim 17.  The '331 patent similarly describes, depicts and claims that embodiments of

the base are disposed on a "surface" or "horizontal surface" (*see, e.g.* claims 1, 9 and 11). The '103 patent similarly describes, depicts and claims embodiments of the base disposed on a "horizontal surface" (*see, e.g.,* Claim 5). *See also* 091/10:45-46 & 103/13:13-14 ("surface such as a table as illustrated in FIG. 29"). The foregoing is consistent with the ordinary meaning of base, for example, a "supporting part or layer; a foundation."[4]

Further, the doctrine of claim differentiation illustrates the error in Humanscale's requirement. "Work surface" is specified in dependent claims 11, 15, 22 and 30 of the '091 patent and claim 3 of the '331 patent. "Work surface" is what differentiates these dependent claims from their respective independent claims, and thus presumptively the independent claims do not require a "work surface," otherwise these dependent claims would be superfluous.[5]

Further, Humanscale's "work surface" position would lead to nonsensical results. For example, "support means having a base for supporting the arm assembly above a support surface" is found in claims 17, 28, 31, 32, 37 of the '978 patent. Although these claims unambiguously specify a "support surface," under Humanscale's erroneous proposed construction, the "base" in the phrase would actually require a "work surface."

The second dispute to be resolved is Humanscale's erroneous position that a "base" must be for "resting on" a surface. The correct phraseology is that a base "engages" a surface. Humanscale's attempt to impose a "resting on" requirement on a base is an erroneous attempt to important a non-infringement argument in to the claims by requiring that an apparatus sit "motionless… without the exertion of force." *See* Humanscale's constructions of "rest[ing] on a ... surface" and "resting on a counter" below. However, the broad ordinary meaning of "base" does not require that an apparatus sit "motionless… without the exertion of force." The

---

[4] Base: A supporting part or layer; a foundation. American Heritage Dictionary of the English Language, at http://education.yahoo.com/reference/dictionary/entry/base; Base: the bottom or supporting part of anything. Collins Dictionary at http://www.collinsdictionary.com/dictionary/english/base.
[5] *See, e.g., Kara Technology v. Stamps.com,* 582 F.3d 1341 (Fed. Cir. 2009).

patentee did not redefine "base" in any manner that would demonstrate manifest exclusion or restriction that would represent a clear disavowal of claim scope. Further, Humanscale's proposed construction requires a likely physically impossible condition.  While an object sits motionless on a surface, forces exist that are exerted on and by the object.  The surface exerts forces, which may include frictional forces, on the object, and the Earth also exerts a gravitational force on the object, including due to the mass of the arms and monitors being supported.  In turn, the object exerts a net downward force on the surface.

Humanscale's attempt to impose this unwarranted limitation serves only to improperly narrow the plain and ordinary meaning of this easily understood term, and it lacks any meaningful support from intrinsic evidence or any possibly relevant extrinsic evidence.

Further, the doctrine of claim differentiation illustrates the error in Humanscale's position.  The limitation of "rest[ing] on a ... surface" is specified in claims 11, 15, 22, 30; claims 3, 9, 11 of the '331 patent and claim 5 of the '103 patent.  Further, "resting on a counter" is specified in claims 11 and 14 of the '103 patent.

Finally, claims 19-20, 25, 29-30, 37-38 of the '978 patent specify "stand[ing] on [a/the] ...surface." Humanscale has no explanation for how a base simultaneously "rests" and "stands".

| C. | **Each of the first computer display and the second computer display is capable of being more vertical than horizontal** ('103 Patent, claim 1) |
|---|---|
| MASS: The angle between the horizontal plane and each of the planes on which the first and second display screens lie can take on at least one value greater than 45 degrees and less than or equal to 90 degrees[6] | Humanscale: the images of the first and second computer displays are both capable of tilting more than 45° up or down from the horizontal |

Consistent with its use in the specification and the claims, the terms "each of the first computer display and the second computer display is capable of being more vertical than

---

[6] Alternatively, "(a) the angle between the plane of the first computer display and the horizontal plane can assume at least one value that is greater than 45° and less than or equal to 90°, and (b) the angle between the plane of the second computer display and the horizontal plane can assume at least one value that is greater than 45° and less than or equal to 90°"

horizontal" means the angle between the horizontal plane and each of the planes on which the first and second display screens lie can take on at least one value greater than 45 degrees and less than or equal to 90 degrees.  MASS's construction is a condensed version of the explanation that the patentee gave to the PTO when he added this limitation:

> in both the first operating position and the second operating position each of the first computer display and the second computer display is capable of being more vertical than horizontal (for displays having flat panels, this means that in both the first operating position and the second operating position (a) the angle between the plane of the first computer display and the horizontal plane can assume at least one value in the interval (45°, 90°], and (b) the angle between the plane of the second computer display and the horizontal plane can assume at least one value in the interval (45°, 90°])

Ex. 9; Excerpt from the File History of the '103 Patent at 10.  For at least this reason, MASS's construction reflects the actual meaning of this term.

Humanscale's definition is wrong because it requires that the displays be "capable of tilting…up or down."  There is no "tilting" requirement in the claim language and there is nothing in the specification or the file history that would require the imposition of such a limitation.  The claim language only requires that each display "is capable of being more vertical than horizontal."  Therefore, a display such as display 192 shown in Fig. 45, would meet this limitation whether it could be tilted up or down, or if it was fixed in this angled orientation.



Humanscale's proposed construction would improperly exclude an embodiment wherein the screen was fixed in such an angled orientation because the display would not be "capable of tilting."  MASS has made no statements nor taken any actions that would require limiting the broad meaning of this term.  Thus, it should be given the construction proposed by MASS.

| D. | extendable from a retracted configuration to an extended configuration ('103 pat. cl. 1) |
|---|---|
| MASS: capable of being adjusted to increase the distance between the ends of the arm assembly | Humanscale: capable of telescoping to adjust the distance between the monitors |

Consistent with its use in the specification and claims of the '103 Patent, the term "extendable from a retracted configuration to an extended configuration" means capable of being adjusted to increase the distance between the ends of the arm assembly. For example, claim 1, limitation (i) of the '103 patent states that "the arm assembly is extendable from a retracted configuration to an extended configuration, the distance between the one end [of the arm assembly] and the opposite end being greater in the extended configuration that in the retracted configuration." This limitation makes it clear that the system includes a mechanism capable of transforming the arm assembly from a retracted configuration to an extended configuration by increasing the distance between the ends of the arm assembly. The specification of the '103 patent provides at least two examples of arm assemblies that are extendable from a retracted configuration to an extended configuration, illustrated in Figs. 44-49 and Figs. 123-126.

The phrase "capable of telescoping" in Humanscale's myopic construction is too narrow for several reasons. First, it excludes a hinge mechanism (hinge 196) taught in the specification that allows the system to transform from a retracted configuration (Fig. 45) to an extended configuration (Fig. 47). Humanscale's definition fixates on and imports limitations from another embodiment (*e.g.*, a telescoping mechanism) taught in Figs. 44-48 and Figs 123-126.

Second, Humanscale's unduly restrictive construction merely imports limitations from the specification, namely, "enabl[ing] the upper support arm 188 to be extended (i.e., telescoped) relative to the lower support arm 186." (col. 14, lines 40-42) However, "[o]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319-20 (Fed. Cir. 2005) (*en banc*). Here,

Humanscale improperly attempts to import the limitations of a single embodiment (*i.e.*, telescoping) into its proposed construction. However, the meaning of extendable in the context of the '103 patent is broader and, as described by the plain language of the claims, should include any configuration whereby the distance between the ends of the arm assembly may be increased. Certainly, telescoping is one way to accomplish this, but it is not the only way taught in the specification and the claims should not be limited to a single embodiment.

In addition, claim 4 (which requires that the "arm that extends from the column is adapted to telescope") further clarifies that the scope of claim 1 cannot be properly limited to only a telescoping arm as Humanscale proposes. The well-established doctrine of claim differentiation further illustrates the error of Humanscale's position because Humanscale's proposed construction would improperly render claim 4 superfluous.[7] Accordingly, Humanscale's proposed construction should be rejected.

| F. | means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree[8] |
|---|---|
| MASS:<br>Function: adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree<br><br>Structure: (1) ball 56, shaft 58, and socket 60, rear of the display 16 (see Figures 8 and 9), plus equivalents; or (2) ball 172, shaft 174, socket 170, rear of the display 152 (see Figure 20), plus equivalents.[9] | Humanscale:<br>[AGREED]<br><br>Structure: Embodiment 1 ball 56, vertical projections 66 extending from ball 56, horizontal projections 68 extending from ball 56, socket 60, vertically registered slots 62 formed in socket 60, and horizontally registered slots 64 formed in socket 60 (Figures 8 and 9) OR Embodiment 2 ball 172, projections 180 extending from ball 172, socket 170, and slots 178 formed in socket 170 (Figure 20) |

This phrase is a MPF claim limitation under 35 U.S.C. § 112(6). MPF elements cover the structure disclosed in the specification that performs and is clearly linked to the claimed

---

[7] *See, e.g., Kara Technology v. Stamps.com,* 582 F.3d 1341 (Fed. Cir. 2009).

[8] '978 patent claims 16-18, 25, 27-28, 35, 37-38.

[9] Alternatively: Structure: A joint having a first portion supported from the arm assembly connected to a second portion supported from the rear of the display, the joint providing an axis of rotation behind the display allowing the second joint portion to pivot about the axis, and all equivalents.

function.[10] The parties agree that the disclosed function, as clearly set forth in the claim, is "adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree." However, the parties disagree about the structure that performs the function.

As an initial matter, the Texas Court identified the structure for performing the identified function as follows: "Structure: ball 56, shaft 58, and socket 60, plus equivalents (Figures 8 and 9). OR ball 172, shaft 174, socket 170 with flat surface 190, shell 184 with flat 192, plate 182, screws 186, rear of the display 152, plus equivalents." Ex. 7; App. B. Here, both MASS and Humanscale agree that the structure should include ball 56, shaft 58, and socket 60 in Figs. 8 and 9 and ball 172, shaft 174 and socket 170 from Fig. 20. Consistent with the structure in the specification clearly linked to the function and Texas Court's construction, MASS also proposes that the rear of the display (16 and 152) should also be included. Humanscale erroneously disagrees. The figures below highlight the structure identified in MASS's proposed construction:



(1) ball 56, shaft 58, and socket 60, rear of the display 16 (see Figures 8 and 9), plus equivalents;

or (2) ball 172, shaft 174, socket 170, rear of the display 152 (see Figure 20), plus equivalents.

---

[10] *See, e.g., Diagnostics Corporation v. Elekta AB, Elekta Instrument AB, Elekta Instruments, Inc.*, 344 F.3d 1205 (Fed. Cir. 2003).

The Texas Court specifically addressed the issue of whether the rear of the display should be included as part of the structure, correctly finding that the structure includes "the rear of the display 152."[11] Accordingly, the structure includes rear of the display.

Humanscale improperly attempts to include unnecessary structure that is not clearly linked to the function, namely: vertical projections 66 extending from ball 56, horizontal projections 68 extending from ball 56 … vertically registered slots 62 formed in socket 60, and horizontally registered slots 64 formed in socket 60 (Figures 8 and 9) and projections 180 extending from ball 172 … and slots 178 formed in socket 170 (Figure 20). However, these structures are not clearly linked to the function of adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree. All that is needed to perform the required function is a ball and socket joint and the rear of the display.

When construing claim terms in § 112, 6 format, it is only the structure used to accomplish the claimed function that is significant: structure that accomplishes other functions is immaterial and not part of the claim analysis. *See, Wenger,* 239 F.3d at 1233; *Acromed Corp. v. Sofamor Danek Group,* 253 F.3d 1371, 1382 (Fed. Cir. 2001) ("A court may not import into the claim structural limitations from the written description that are unnecessary to perform the claim function."). As expressed in the '978 patent at 3:63 – 4:15; 7:15 and shown in Figures 9 and 20, the pins engage the back of the slots to *limit* the extent to which the preferred embodiment joint may pivot, but do not themselves perform the adjusting means.

---

[11] "The specification teaches that the arm mounts to the back of the display. See '978 patent, Col. 7:9–11 ("The plate is then fastened with screws (such as the screw 188) to the back of the display 152."); see also, id., Col. 3:63–66 ("The mounting structure 50 includes a ball joint comprising a steel ball 56 formed on a steel shaft 58 supported from the arm 18 and a plastic socket 60 supported from the rear of display 16."). The figures illustrate that the mounting means attaches to the rear of the display. Id., Figures 1–6, 12–18, and 20 … The specification makes clear that the mounting means is limited to being attached to the back of the display. Accordingly, the structure includes 'the rear of the display 152.'" Texas Case, Dkt. No. 266 at 12.

Structure unnecessary to perform the claimed function is irrelevant in construing § 112, 6 limitations. *Wenger,* 239 F.3d at 1233; *Acromed,* 253 F.3d at 1382.

The Texas Court specifically addressed and properlty rejected the inclusion of the very same structure that Humanscale now seeks to improperly add:

> The parties dispute whether the slots and projections[8] should be included as structure for the mounting means … The specification makes clear that the projections and slots are preferable, which denotes they are not required. '978 patent, Col. 5:57–58… Importing "structural limitations from the written description that are unnecessary to perform the claimed function" is improper. Wenger, 239 F.3d at 1233. The specification does not associate the projections and slots with performing the mounting means function. Accordingly, the projections and slots are not necessary structure.

Ex. 5 at 11-12. Thus, the projections and slots are not necessary structure.

Finally, MASS's alternate construction puts in plain English the proper structure linked to the claimed function, namely a joint which provides an axis of rotation behind the display allowing the second joint portion to pivot about the axis. Either of MASS's proposed constructions is correct because they include the structure clearly linked to the function and exclude structures unnecessary for performing the function.

| G. | means for adjusting the angular orientation of each of the display relative to the arm assembly about a generally vertical axis to thereby permit said displays to be angled relative to each other to a desired degree ('978 patent claim 17) |
|---|---|
| MASS:<br><br>Function: adjusting the angular orientation of each of the displays relative to the arm assembly about a generally vertical axis to thereby permit said displays to be angled relative to each other to a desired degree [AGREED]<br><br>Structure: Same as for structure of F. | Humanscale:<br>Function: AGREED.<br><br>Structure: Embodiment 1 ball 56, vertical projections 66 extending from ball 56, horizontal projections 68 extending from ball 56, socket 60, vertically registered slots 62 formed in socket 60, and horizontally registered slots 64 formed in socket 60 (Figures 8 and 9)<br>OR Embodiment 2 ball 172, projections 180 extending from ball 172, socket 170, and slots 178 formed in socket 170 (Figure 20) |

The phrase "means for adjusting the angular orientation of each of the display relative to the arm assembly about a generally vertical axis to thereby permit said displays to be angled

relative to each other to a desired degree" is a MPF claim limitation under 35 U.S.C. § 112(6). The parties agree that the disclosed function, as clearly set forth in the claim, is "adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree." The parties also agree that the structure for performing the stated function is the same structure as set forth for the term "means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree" in Section F. However, as set forth Section F, the parties disagree regarding what that structure is. MASS incorporates here its arguments set forth above in Section F.

| H. | mounting means for mounting the displays to the arm assembly ('978 Patent, claims 16-18; 25, 27-28, 35, 37-38. |
|---|---|
| MASS:<br>Function: mounting the displays to the arm assembly [AGREED]<br><br>Structure: Same as for structure of F.<br><br>Alternatively, same as for structure 11 but add (1) tabs 80 and 82, hole 72 (Figures 8 and 9); or (2) screws 188 (Figure 20) | Humanscale:<br>Function: AGREED.<br><br>Structure: an essentially permanent connection between each display and the arm that permits the displays to be mounted in multiple different configurations, consisting of:<br><br>Embodiment 1 ball 56, shaft 58, socket 60, hole 72, pair of tabs 80, and single tab 82 (Figures 8 and 9) OR Embodiment 2 ball 172, shaft 174, socket 170 with flat surface 190, shell 184 with flat 192, plate 182, screws 186, screws 188, plug 194, socket 198 (or 202 or 204), and bolt 200 (Figure 20) |

The phrase "mounting means for mounting the displays to the arm assembly" is a MPF claim limitation under 35 U.S.C. § 112(6). The parties agree that the disclosed function, as clearly set forth in the claim, is "mounting the displays to the arm assembly." However, the parties differ, in part, as to the structure that performs the claimed function.

Both parties agree that the structure should include ball 56, shaft 58, and socket 60, ball 172, shaft 174, and socket 170. MASS further includes the rear of the display 16 and 152, which is consistent with the Texas Court's construction (see Ex. 5, Dkt. No. 266 at 12). This is also

consistent with the specification which describes that the "steel ball 56 … steel shaft 58 … and a plastic socket 60 *supported from the rear of display* 16." 978/3:63-66 (emphasis added).  MASS also incorporates the arguments made above in Section F which further establish that the rear of the display should be included in the structure.

In addition to improperly excluding the rear of the display, Humanscale seeks to improperly include additional structure that is not clearly tied to the function (e.g., hole 72, pair of tabs 80, single tab 82, flat surface 190, shell 184, plate 182, screws 186/188, plug 194, socket 198 and bolt 200).  None of this structure is necessary to perform the agreed function of mounting the displays to the arm assembly.

In addition, Humanscale attempts to further define the function of its identified structure (despite having already agreed to the proper function) by including the prefatory statement that the structure must form "an essentially permanent connection between each display and the arm that permits the displays to be mounted in multiple different configurations, consisting of."  Such limitations are improper at least because the Humanscale is attempting to further define the *function* of the MPF element, rather than defining the *structure*.  In addition, such functional limitations are improper.  For instance, there is nothing in the claim or the specification that requires that the any connection be "essentially" (which is vague on its face) permanent.  Nor is there any requirement that the displays be "permitted to be mounted in multiple configurations" (which, again, is vague and ambiguous on its face).  Humanscale's improper attempt to include unnecessary and unrequired functionality under the guise of structure should be rejected.

| I.          mounting member ('331 patent claims 1, 9) | |
|---|---|
| MASS: a member of the support arm structure used for mounting | Humanscale: a protrusion from the support arm or vertical support column used to secure the arm to the column by insertion into a hollow recess in the other piece |

Consistent with its use in the claims and specification of the '331 Patent, a "mounting member" is a member of the support arm structure used for mounting. Exemplary claim 1 states

"a mounting member with a hole and at least one aperture, such that the support arm structure, and the single piece support arm thereof, is secured to the support column through the mounting member by an acceptance of the mounting portion of the support column into the hole and by at least one external fastening element that engages with the at least one aperture." The specification of the '331 Patent provides examples of certain mounting members. For instance, Fig. 6 shows mounting member 36 and mounting member 42. In one embodiment, mounting member 42 is inserted within the recess 38. 331/4:1-2. In another embodiment, mounting member 36 lays over the two boss portions 46 and 50 with apertures 40 and 41 aligned with apertures 48 and 52, respectively. 331/4:2-4. These embodiments are consistent with MASS's construction (*i.e.*, "a member of the support arm structure used for mounting").

Humanscale's unduly restrictive construction attempts to import limitations from a single embodiment to the exclusion of other disclosed embodiments. As previously described, it is a "cardinal sin" of claim construction to import limitations from the specification into the claims. *Phillips*; 415 F.3d 1303, 1319-20. In addition, Humanscale's proposed construction would exclude the configuration of mounting member 36. "It is elementary that a claim construction that excludes a preferred embodiment is rarely, if ever correct." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002). For at least these reasons, Humanscale's proposed construction should be rejected and the court should construe "mounting member" as a member of the support arm structure used for mounting.

| J. | **positioning means for positioning displays** ('978 pat., cl. 16-18, 24. 26-28, 34, 36-38) |
|---|---|
| MASS: positioning means for positioning displays | Humanscale:<br>Function: positioning the displays in a cooperative, interdependent fashion<br>Structure: *See* Ex. 10. |

It is well established that "[w]hile the use of the word 'means' gives rise to a presumption that §112, paragraph 6 applies, the presumption is overcome by the recitation of the

structure needed to perform the recited function." *TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1135 (Fed. Cir. 2004).

Here, the claim language of the '978 Patent recites sufficient structure. For instance, claim 16 states "positioning means for … comprising:" an arm assembly, "support means …," "mounting means …," and "means for adjusting …." '978 patent, Col. 11:10–12:2. Although the recited structure includes MPF limitations, there is sufficient structure in the claim language such that Section 112, ¶ 6 does not apply. *British Tel. PLC v. Prodigy Commc'n Corp.*, 189 F. Supp. 2d 101, 110 (S.D.N.Y. 2002); *see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359–60 (Fed. Cir. 2004) ("we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function"). The Texas Court's construction reaches this same conclusion. *See* Ex. 5, pgs. 6-8. The structure is identified by both specific components (e.g., arm assembly) and functions (e.g., mounting means for mounting and supporting means for supporting). "The structure of the component parts is present-it is just found in a different part of the patent, in the specification, rather than in the claim language." *British Tel. PLC*, 189 F. Supp. 2d at 110. Accordingly, this is not a MPF limitation. One of ordinary skill in the art would understand "positioning means" as an "apparatus used to position displays."

Humanscale contends that this term is to be construed under 35 U.S.C. § 112, 6; however, the term is clearly not subject to § 112, 6. Although use of the term "means" creates a rebuttable presumption that the language is a § 112, 6 limitation, the presumption is not conclusive and does not automatically invoke § 112, 6. *York Prods., Inc. v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1574 (Fed. Cir. 1996). One instance in which the presumption is rebutted occurs when a claim uses the term "means," but that claim also recites structure defining the means for performing the function. *Searfos v. Pioneer*

*Consolidated Corp.,* 374 F.3d 1142, 1149 (Fed. Cir. 2004) ("The claim specifically recites the structure that performs the claimed function … thus overcoming the presumption resulting from use of the word 'means.'"); *Personalized Media Communications, L.L.C. v. Int'l Trade Comm'n,* 161 F.3d 696, 704 (Fed. Cir. 1998); *see also, Cole v. Kimberly-Clark Corp.,* 102 F.3d 524, 531 (Fed. Cir. 1996); *Sage Prods. v. Devon Indus., Inc.,* 126 F.3d 1420, 1427-28 (Fed. Cir. 1997) ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format").

| K. | rest[ing] on a … surface[12] | |
|---|---|---|
| MASS: No construction necessary; plain & ordinary meaning. Alternatively, stay[ing] still on a surface | Humanscale: sitting motionless on top of a surface, without the exertion of force | |
| **L.** | **resting on a counter** | |
| MASS: No construction necessary; plain & ordinary meaning. Alternatively, stay[ing] still on a counter | Humanscale: sitting motionless on top of a counter, without the exertion of force | |

Both parties agree that "surface" and "counter" have an ordinary meaning and need no construction. The well understood term "rest[ing]" also has a plain and ordinary meaning, including to a person of ordinary skill in the art or a lay juror. The use of this term throughout the claims of the patents-in-suit is consistent, and claim 11 of the '091 patent is representative, wherein, the base structure is designed to "rest on a work surface." Further, the specifications of the patents-in-suit provide examples of a base designed to rest on a surface. For example, in the '103 Patent, "[t]he pairs of screens 140 and 142 can be swung open … and stood on a surface such as a table." 103/13:12-14; Fig. 29. The '103 Patent describes that "[t]he base is substantially smaller … thus freeing up a substantial amount of desk space." 103/2:10-12.

---

[12] '091 patent claims 11, 15, 22, 30 ("the base structure is designed to rest on a work surface"); '331 patent claims 3 ("the base is adapted to rest on a flat and horizontal work surface"), 9 ("for resting on a surface"), 11 ("the base is resting on a horizontal surface"); '103 patent claim 5 ("the base is adapted to rest on a horizontal surface").

Courts "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution."[13] Humanscale lacks any basis to overcome this heavy presumption. The term "rest[ing] on a … surface" has an easy to understand meaning in plain English and thus it needs no construction by the Court.[14]  In some cases, the ordinary meaning of claim language as understood by a person of skill in the art[15] may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words."[16]

The patentee of the '978, '091 and '103 Patents did not redefine "rest[ing]" in any manner that would demonstrate manifest exclusion or restriction that would represent a clear disavowal of claim scope. Accordingly, the term "rest[ing] on a … surface" should be interpreted in light of its plain and ordinary meaning to one skilled in the art.[17]

Humanscale's improper attempt to import the improper limitation of "without the exertion of force" lacks any support from ordinary meaning, the intrinsic evidence or any possibly relevant extrinsic evidence, and it should be rejected. This issue, including the fact that Humanscale's construction is contrary to the laws of physics, is already addressed in Section B above, so to avoid repetition that discussion is respectfully incorporated herein.

| M. | stand[ing] on [a/the] ... surface ('978 patent claims 29, 19 and 38) |
|---|---|
| MASS: No construction necessary; plain & ordinary meaning. Alternatively, be[ing] placed on a surface. | Humanscale: freestanding in an upright, motionless position on top of a surface |

---

[13] *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1323 (Fed. Cir. 2003) (Courts "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution.).

[14] *See, e.g., O2 Micro Int'l v. Beyond Innovation Technologies*, 521 F.3d 1361, 1362 (Fed.Cir.2008).

[15] MASS submits that a person of ordinary skill in the art of the subject matter claimed by the patents-in-suit is a person having a bachelor's degree in industrial design or mechanical engineering and approximately 0-3 years of experience in product design.

[16] *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1314 (Fed. Cir. 2005) (en banc).

[17] *See Teleflex*, 299 F.3d at 1327.

The well understood term "stand[ing] on [a/the] ... surface" has a plain and ordinary meaning, including to a person of ordinary skill in the art as well as to a lay juror. Everyone understands that an object that is standing on a surface has been placed on that particular surface. This term is very similar to the "resting" terms discussed in Sections K and L, and MASS incorporates its arguments from those sections here. MASS has made no statements nor taken any actions that would require limiting the broad meaning of this term. Accordingly, "stand[ing] on [a/the] ... surface" should be given its plain and ordinary meaning.

Humanscale again improperly attempts to add limitations to the well-understood meaning of this term that appear nowhere in the specification or file histories of the patents-in-suit. For instance, simply adding "free" before the word standing does nothing to clarify the common meanin+g of standing. Indeed, it only serves to confuse its well understood meaning. Similarly, Humanscale's proposed requirements of "upright" and "motionless" are also improper. Humanscale's attempt to import limitations serves only to obfuscate the plain and ordinary meaning of this easily understood term.

Assuming, *arguendo*, that this term does require construction, which is does not, it should be construed at "be[ing] placed on a surface." This is consistent with the both the claims and the specification of the '978, '103 and '331 Patents. For instance, specification of the '978 Patent states "[r]eference is made to FIGS. 1-6 which illustrate a first display system 10 which includes a base 12 configured to stand on a horizontal surface…" 978/3:20-22. Even a cursory review of these figures illustrates that the system is configured to be placed on a horizontal surface:



FIG. 1

For at least these reasons, the Court should give this term its plain and ordinary meaning or, in the alternative, should construe it to mean "be[ing] placed on a surface."

| N. | support arm structure [having a single piece support arm] ('331 patent cl. 1, 9) | |
|---|---|---|
| MASS: No construction necessary; plain & ordinary meaning. Alternatively, support arm structure including a single piece support arm. | Humanscale: a complete arm structure formed as a single cast piece with a preconceived radius of curvature | |

The term "support arm structure" requires no construction because (a) it has a plain and ordinary meaning and (b) the requirements and/or limitations of the support art structure are set forth in the claim language itself. No further definition or clarification of this easily understood term is necessary. The claim language of the '331 Patent provides context for a "support arm structure," namely that the support arm structure has "a single piece support arm that extends on either side of the support column and that has a longitudinal length that is longer than the width of the base." *See* claim 1. Claim 9 describes the support arm structure as "having a support arm that extends on either side of the column, that is substantially horizontal when the base is resting on a horizontal surface and that has a longitudinal length that is longer than the width of the base." As is often the case, here "[t]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Nothing further is required of a support arm structure than what the claims specify, as set forth above.

Humanscales's proposed construction impermissibly seeks to reword "support arm structure" as "a complete arm structure formed as a single cast piece with a preconceived radius of curvature." However, the claim recites that the support arm structure has a single piece support arm. Thus, it is the support arm and not necessarily the support arm structure that is a single piece. In addition, Humanscale's proposed construction is hopelessly vague and confusing (e.g., what constitutes a "complete" structure and what is a "preconceived" radius?). Humanscale also attempts to improperly import limitations from the specification into the claims. For instance, in one embodiment of the support arm structure, the "horizontal support arm 26 is

preferably formed (*i.e.,* cast) as a single piece component….” 331/3:28-29. Even setting aside that the element being described as cast is the horizontal support arm, not the support arm structure, it would be improper to import the “cast” limitation from the description of a preferred embodiment into the claims. Similarly, although some specific embodiments specify a particular radius of curvature for the support arm, it is improper to introduce the limitation that the support arm structure must have a preconceived radius of curvature. For example, nothing in the specification precludes an embodiment in which the arm has more than one radius of curvature.

Alternatively, should the Court deem it necessary to construe “support arm structure,” then, consistent with the ordinary meaning of these terms in the context of the patent, an appropriate construction is “support arm structure including a single piece support arm.” This construction is consistent with and supported by both the claims and the specification. For instance, claim 1 requires the “support arm structure having a single piece support arm.” Nothing in claims 1 or 9 require that the support arm structure be “formed as a single cast piece” or that it have a “preconceived radius of curvature.”  However, illustrating the impropriety of Humanscale’s proposed construction, certain unasserted claims (*e.g.*, claims 5 and 18) both require that the support arm have a specific radius of curvature. Had the patentee desired to require a “preconceived radius of curvature” in asserted claims 1 and 9, he could have done so as he did in claims 5 and 18. However, he chose not to so limit claims 1 and 9 and Humanscale should not be permitted to come back now and improperly insert such limitations.

For at least these reasons, “support arm structure” should be given its plain and ordinary meaning. In the alternative, should the Court find that this term requires construction, it should be construed as “support arm structure including a single piece support arm.”

| O. | support means for supporting the arm assembly from the base member[18] |
|---|---|
| MASS:<br>Function: supporting the arm assembly from the base member [AGREED]<br><br>Structure: (1) upright 20, circular recess 34, washer 36, and bolt 38 (see Figure 7), plus equivalents; (2) upright 105, shafts 118, 120, plus equivalents (Figure 12); or (3) upright 158, socket 206, plug 208, and bolt 210 (see Figure 19), plus equivalents.<br><br>Alternatively: Structure: (1) upright 20 (see Figure 1-7), (2) upright 105 (Figure 12), or (3) upright 158 (see Figures 17-19), plus equivalents. | Humanscale:<br>Function: AGREED<br><br>Structure: a structure having one upright that supports all of the constituent parts of the arm assembly, consisting of:<br><br>Embodiment 1 upright 20, circular recess 34 in upright 20, generally circular central projection 32, washer 36, and bolt 38 (Figure 7)<br>OR Embodiment 2 upright 105, central shaft 114, central toothed gear 116, rotary shaft 118 with toothed part-circular gear 122, rotary shaft 120 with toothed part-circular gear 124 (Figures 12 & 13)<br>OR Embodiment 3 upright 158, socket 206 in upright 158, plug 208, and bolt 210 (Figure 19) |

The phrase "support means for supporting the arm assembly from the base member" is a MPF claim limitation under 35 U.S.C. § 112(6). The parties agree that the disclosed function, as clearly set forth in the claim, is "supporting the arm assembly from the base member." However, the parties disagree regarding the structure that performs the function.

As an initial matter, the Texas Court construed this term to include the following structure: "Structure: upright 20, circular recess 34, washer 36, and bolt 38 (Figure 7) OR upright 158, socket 206, plug 208, and bolt 210 (Figure 19)." Ex. 7; App. B. Here, both MASS and Humanscale agree that the all of the structure identified by MASS should included as performing the claimed function, as follows: upright 20, circular recess 34, washer 36, and bolt 38 (as shown in Fig. 7); upright 105, shafts 118, 120 (as shown in Fig. 12) and upright 158, socket 206, plug 208, and bolt 210 (as shown in Fig. 19). The figures below highlight the structure identified in MASS's proposed construction:

---

[18] '978 patent claims 16, 21-22, 27, 38.



(1) upright 20, circular recess 34, washer 36, and bolt 38 (Figure 7)

(2) upright 105, shafts 118, 120 (Figure 12)



(3) upright 158, socket 206, plug 208, and bolt 210 (Figure 19)

Humanscale improperly proposes additional structures that are not necessary for the claimed function. The Texas Court properly rejected most of these arguments, as follows:

> Figure 7 depicts a rotary joint "configured to perform two functions: to support the arm 18 for rotation about a generally horizontal axis 26 through the upright 20, and to define distinct vertical and horizontal arm positions." *Id.* at 3:29–34. As stated above, the claimed function is supporting the arm assembly not defining "two distinct vertical and horizontal arm positions." Importing "structural limitations from the written description that are unnecessary to perform the claimed function" is improper... Although the specification teaches that the cylindrical recess 44, ball 46, and biasing spring 48 perform the second function of the rotary joint—locking the arm in vertical or horizontal positions—it never references that the three components support the arm. '978 patent, Col. 3:44–53.

*See* Ex. 5, p. 9.  The extra structures listed by Humanscale are either related to the rotary joint function or, at a minimum, simply not necessary for supporting the arm assembly.  As such, they should not be included in the Court's construction.

Finally, MASS's alternative construction properly focuses on the actual structures that support the arm assembly, i.e., the uprights.  Accordingly, at a minimum it should be adopted.

| P. | support means having a base for supporting the arm assembly above a support surface ('978 patent claims 17, 28, 31, 32, 37) |
|---|---|
| MASS:<br>Function: supporting the arm assembly above a support surface [AGREED]<br><br>Structure: Same as for O plus the base. | Humanscale:<br>AGREED.<br><br>Structure: Same as "support means for supporting the arm assembly from the base member" and including base 12/156 |

The parties agree that the function of "support means having a base for supporting the arm assembly above a support surface" is the same as that for the term "support means for supporting the arm assembly from the base member" (*see* Section O), namely "supporting the arm assembly above a support surface."

The parties also agree that the structure for this term should be the same as that set forth by the parties for "support means for supporting the arm assembly from the base member" (*see* Section O), except that the base should also be included. Humanscale proposes to specifically identify the base by number (i.e., "12/156"); however, such identification is not necessary including because "base" has already been construed in Section B, above.

With regard to the additional structure that Humanscale improperly attempts to include, MASS incorporates here its objections from Section O, above.

| Q. | support surface ('978 patent claims 17, 29, 37) |
|---|---|
| MASS: surface that supports the base | Humanscale: surface on which the base stands |

Consistent with the claims, the specification and the file history of the '978 Patent, the term "support surface" should be given its plain and ordinary meaning of "surface that supports the base." This construction is also consistent with this term's prior construction in the Texas Case. There, the court construed support surface as follows: "The specification describes the support surface as the horizontal surface on which the base stands. *See id.*['978 patent, Col. 3:21–22]. Thus, it is more accurate to state that the support surface supports the base. Accordingly, one of ordinary skill in the art would understand that "support surface" means a

"surface that supports the base." Ex. 7; App. B.  Here, there is no reason to depart from the Texas

Court's well-reasoned construction. In addition to the reference to the specification cited in the

Texas Court's claim construction order, the claims provide additional context that supports

MASS's proposed construction. For example, claim 29 requires that the support surface is "a

horizontal surface of a desk and the base is configured to stand on the horizontal surface."

Similarly, claim 37 requires that the support surface be "a horizontal surface of a desk." Thus,

the use of the term "support surface" is consistent throughout the specification and claims of the

'978 Patent and is the surface that supports the base.

Humanscale's proposed construction is improperly narrow. Where the patentee chose to

require that the base "stand" on a surface, he specifically included the word "stand." For

instance, both claims 29 and 37 require that the base be "configured to stand" on the horizontal

or support surface. Inclusion of the word "stand" in the construction of "support surface" is not

only improperly narrow but it is also redundant because the claim language itself specifies when

the base must "stand" on a surface.

| R. | the ends are oriented vertically ('103 patent claim 2) |
|---|---|
| MASS: No construction necessary; plain & ordinary meaning. Alternatively, the ends of the arm assembly are oriented vertically | Humanscale: the arm assembly is oriented vertically, such that the computer display at one end of the arm assembly is stacked directly above the computer |

The term "the ends are oriented vertically" has a plain and ordinary meaning, including to

a person of ordinary skill in the art as well as to a lay juror. The use of this term throughout the

'103 patent is consistent. Claim 2 requires that "the ends are oriented vertically when the

structure is in the first operating position." Further, the specification of the '103 Patent provides

examples of a base designed to rest on a work surface. For example, Figure 6 shows an arm 20

connected to an upright stand 22 and base 24 wherein the arm is attached vertically[19] (the arrows

show the ends are also oriented vertically):

---

[19] 103/8:53-59.



FIG. 6

Courts "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution."[20] Plaintiff lacks any basis to overcome this heavy presumption. The term "the ends are oriented vertically" has an easy to understand meaning in plain English and thus it needs no construction by the Court.[21] In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words."[22]

The patentee of the '103 Patent did not redefine this term in any manner that would demonstrate manifest exclusion or restriction and that would represent a clear disavowal of any claim scope. Accordingly, the term "the ends are oriented vertically" should be interpreted in light of its plain and ordinary meaning to one skilled in the art.[23]

Humanscale's proposed construction, which is motivated by a non-infringement position rather than principles of claim construction, should be rejected. As an initial matter, there is no requirement in the claims that the ends be "stacked directly above the computer." Indeed, nowhere in the specification or the file history does the patentee mention, much less require, that the ends be anywhere near a computer. Indeed, as is commonly understood in the

---

[20] *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1323 (Fed. Cir. 2003) (Courts "indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution.).
[21] *See, e.g., O2 Micro*, 521 F.3d at 1362.
[22] *Phillips*, 415 F. 3d at 1314.
[23] *See Teleflex*, 299 F.3d at 1327.

industry and by a lay person, a computer may commonly be placed away from the displays associated with it. Humanscale's improper attempt to require the arm assembly to be "stacked directly above the computer" is baseless. Indeed, Humanscale's proposal even lacks an antecedent basis for "the computer." There is no requirement of a computer in any of the claims of the '103 Patent. Attempting to interject such an entirely new and different component into the claims is transparently improper.

### S.   Agreed terms needing correction.

The parties agree that "oldie arm" in claim 5 of the '331 patent should be construed as "of the arm," and "a plane asymmetry" in claim 11 of the '331 patent should be construed as "a plane of symmetry." These phrases were spelled/worded correctly in the claims submitted by the patentee, *see* Exhibit 8, pp. 8-9 (final set of claims), and they are just typos on the part of the Patent Office.

Courts can correct obvious minor typographical and clerical errors in patents. *Novo Industries v. Micro Molds*, 350 F.3d 1348, 1357 (Fed.Cir.2003). Such errors must be evident on the face of the patent. *Group One v. Hallmark Cards*, 407 F.3d 1297, 1303 (Fed.Cir.2005); *Novo*, 350 F.3d at 1357. An error in a patent is minor, and court has the authority to correct it, if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims. *Novo,* 350 F.3d at 1350.  These obvious typos on the part of the PTO meet all of the these criteria, and thus should be corrected.

### T.   Other agreed terms.

The parties have agreed that "means for connecting one of the displays to the arm at positions spaced along the arm, whereby the spacing between the displays can be adjusted which is found in 25 and 35 of the '978 patent should be construed as follows: "Function: connecting one of the displays to the arm at positions spaced along the arm, whereby the spacing between

the displays can be adjusted. Structure: socket 202, socket 204, plug 194 and bolt 200, plus equivalents." This is evident from Figure 19 from Column 7, lines 31-42 of the '978 patent.

The parties have also agreed that external fastening element, which is found in claims 1 and 9 of the '331 patent, means a component that is initially outside the support arm structure and the support column, and which secures the support arm structure to the support column. Each of these claims refers to "at least one external fastening element that engages with the at least one aperture." As depicted in Figures 6 and 8, the '331 specification refers to external "fastening elements (not shown) placed in apertures 56" which extend into bores 58 and 52. '331/3:55-62 & 4:4-13. The agreed construction is the ordinary meaning of this term in context.

The parties have further agreed that the term "integral" in claims 13, 17, 24 of the '091 patent means "one piece." Each of these claims refers to the second and third support arms being "integral." Consistent with the ordinary meaning of "integral" being once piece, in Figures 53 and 54 of the '091 patent, the second and third support arms are each integral in that each consists of one piece of material.

## V.    CONCLUSION

For the reasons set forth above, Mass's proposed constructions should be adopted and Humanscale's proposed constructions should be rejected.


DATED: October 10, 2013                    Respectfully submitted,

                                           /s/ Theodore A. Breiner
                                           Theodore A. Breiner (VA Bar No. 20531)
                                           BREINER & BREINER, L.L.C.
                                           115 North Henry Street
                                           Alexandria, Virginia 22314-2903
                                           Telephone: 703-684-6885
                                           Facsimile: 703-684-8206
                                           tbreiner@bbpatlaw.com

                                           John J. Edmonds (*pro hac vice*)
                                           jedmonds@cepiplaw.com
                                           Stephen F. Schlather (*pro hac vice*)

sschlather@cepiplaw.com
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: 713-364-2371
Facsimile: 832-415-2535

ATTORNEYS FOR DEFENDANTS MASS
ENGINEERED DESIGN INC. AND JERRY
MOSCOVITCH

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2013, I am serving the foregoing  DEFENDANTS'

OPENING CLAIM CONSTRUCTION BRIEF via email to the following:


Frederic M. Meeker
Christopher Roth
BANNER & WITCOFF LTD. (DC)
1100 13th Street NW, Suite 1200
Washington, DC 20005-4051
fmeeker@bannerwitcoff.com

Jason Charkow
WINSTON & STRAWN, LLP
200 Park Avenue
New York, New York 10166
jcharkow@winston.com

Adam Roger Steinert
Kurt Niederluecke
FREDRIKSON & BYRON P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
asteinert@fredlaw.com
kniederluecke@fredlaw.com


DATE: October 10, 2013

*/s/ Theodore A. Breiner*
Theodore A. Breiner


ATTORNEYS FOR DEFENDANTS MASS
ENGINEERED DESIGN, INC. AND
JERRY MOSCOVITCH