**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| Humanscale Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:13-cv-00535-CMH-IDD |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Mass Engineered Design, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................................1

II.     LEGAL FRAMEWORK ......................................................................................................1

III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS................................................1

   A.  arm ...............................................................................................................................1

   B.  base/base member/base structure ..............................................................................2

   C.  each of the first computer display and the second computer display is capable
      of being more vertical than horizontal ......................................................................5

   D.  extendable from a retracted configuration to an extended configuration...............5

   E.  mounting portion ........................................................................................................5

   F.  means for adjusting the angular orientation of each of the displays relative to
      the arm assembly to thereby  permit said displays to be angled toward each other
      to a desired degree .....................................................................................................5

   G.  means for adjusting the angular orientation of each of the displays relative to
      the arm assembly  about a generally vertical axis to thereby permit said displays to be
      angled relative to each other to a desired degree.....................................................5

   H.  mounting means for mounting the displays to the arm assembly ...........................5

   I.  mounting member ......................................................................................................5

   J.  positioning means for positioning displays..............................................................5

   K.  rest[ing] on a ... surface............................................................................................5

   L.  resting on a counter ...................................................................................................5

   M.  stand[ing] on [a/the] ... surface...............................................................................5

   N.  support arm structure [having a single piece support arm] .....................................5

   O.  support means for supporting the arm assembly from the base member ..............5

   P.  support means having a base for supporting the arm assembly above a
      support surface ...........................................................................................................5

**Q.  support surface**........................................................................................................................................**5**

**R.  the ends are oriented vertically**...........................................................................................................**5**

**IV.       CONCLUSION** ..............................................................................................................................................**4**

# TABLE OF AUTHORITIES

*British Tel. PLC v. Prodigy Commc'n Corp.*,
    189 F. Supp. 2d 101, 110 (S.D.N.Y. 2002) ....................................................13

*Caluori v. One World Technologies, Inc.*,
    2010 WL 4794234, *5 (C.D.Cal. Nov. 12, 2010) ..............................................1

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315, 1326 (Fed. Cir. 2012)...............................................................7

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed.Cir.2000) .........6

*Emsat Advanced Geo–Location Tech., LLC v. Metropcs Commc'ns.*,
    No. 2:08–CV–381–DF–CE, 2010 WL 2573075, at *6 (E.D.Tex. June 23, 2010) ..............1

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354, 1359–60 (Fed. Cir. 2004).........................................................13

*NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ...........2, 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351, 1362 (Fed. Cir. 2008).................................................................1

*Phillips v. AWH Corp.*,
    415 F.3d 1303, 1319-20 (Fed. Cir. 2005) (*en banc*) ...........................1, 8, 13, 16

*Saffran v. Johnson & Johnson*, 712 F.3d 549, 565-66 (Fed. Cir. 2013) .........................................6

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342, 1347 (Fed. Cir. 2005) ............................................................17

*Skinmedica, Inc. v. Histogen, Inc.*,
    737 F.3d 1187 (Fed. Cir. 2013)...........................................................1, 5, 7

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358, 1362 (Fed. Cir. 2007)...........................................................1, 7

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313, 1327 (Fed. Cir. 2002) ..............................................................20

*Thorner v. Sony Computer Entertainment America LLC*,
    669 F.3d 1362, 1365 (Fed. Cir. 2012) ....................................................6, 8, 16

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576, 1583 (Fed. Cir. 1996) ............................................................................................7

MPEP 1302.14 ...............................................................................................................................17

## I.      INTRODUCTION

Humanscale seeks to add unwarranted and improper limitations to the claims. Further, Humanscale seeks to construe the claims contrary to their plain and ordinary meaning, without any justification for doing so. As already addressed in part in MASS's Opening Brief and as will be further shown below, Humanscale's attempts to re-write the claims should be rejected.

## II.     LEGAL FRAMEWORK

The suggestion by Humanscale that *O2 Micro*[1] requires the Court to "construe" terms which have a plain and ordinary meaning is erroneous.  Re-writing claims is not construing them.  *O2 Micro* merely requires the Court to resolve the parties' dispute over a term.  It is sufficient under *O2 Micro* for a court to reject Humanscale's erroneous position as contradictory to plain meaning.[2]

## III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A.  Arm

The term "arm" has well understood ordinary meaning, including in the context of the '978, '091, '103 and '331 Patents (the "patents-in-suit). An arm is an elongate structure connected to and projecting from another structure. Humanscale attempts to improperly shoehorn a non-infringement argument into its purported construction of the term arm by suggesting that the Court adopt a definition of arm that is divorced from plain meaning and the context of the patents-in-suit.  There is nothing in the patents-in-suit that requires or even suggests that an "arm" on a mechanical device must be "similar to a human arm."

In support of its erroneous construction of "arm," Humanscale maintains that it is

---

[1] *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).
[2] *See, e.g., O2 Micro*, 521 F.3d at 1362; *Caluori v. One World Technologies, Inc.*, 2010 WL 4794234, *5 (C.D.Cal. Nov. 12, 2010); *Emsat Advanced Geo–Location Tech., LLC v. Metropcs Commc'ns.*, No. 2:08–CV–381–DF–CE, 2010 WL 2573075, at *6 (E.D.Tex. June 23, 2010).

improper for Mass to "reasonably argue that a column is a "column" in one patent and an "arm" in another."  (Humanscale Op. Br. at 8) Humanscale can cite no case law in support of this proposition because it is wrong.  To take one example, there is no reason why in the detailed description an animal could not be described as a rodent in one patent and that same animal as a mouse in another patent.  Humanscale's argument fails.

The very Fig. 53 of the '091 patent that Humanscale references in support of its construction of Humanscale construes "arm" as "similar to a human arm." However, this figure illustrates why its construction is incorrect.  ARM 2 extends from both sides of the structure to which it is directly connected, unlike a human arm that extends from just one side of the torso. Furthermore, unlike a human arm, ARM 2 is directly connected to ARM 1.



Mass' proposed construction of "arm," as "an elongate structure connected to and projecting from another structure" accurately captures the scope of this term as used in the patents in suit.[3]  Even Humanscale's description that an arm "refer[s] to structures that extend out" from another structure is consistent with Mass' construction.  HS Op. Br. at 8.

Further, Humanscale's erroneous construction would exclude at least the claimed embodiments described in Fig. 53 (above) of the '091 Patent wherein ARM 2 and ARM 3 are

---

[3] Humanscale misleads the Court when it argues that MASS "concedes that 'arm' has its ordinary meaning."  MASS has not proposed that the Court give this terms its plain and ordinary meaning, but rather has proposed a specific construction consistent with the claims and the specifications of the patents-in-suit.  Humanscale Op. Br. at 8.

both connected to and project from ARM 1.  A construction that excludes a claimed embodiment cannot be correct.  *See NeoMagic Corp. v. Trident Microsystems, Inc*., 287 F.3d 1062, 1074 (Fed. Cir. 2002).

Finally, MASS's proposed construction is consistent with the constructions set forth by the Texas Court.  Specifically, the Texas Court construed "arm assembly" to mean "a structure having one or more constituent parts *connected to and projecting from* the support means." MASS's Op. Br.; Ex. 5 at App. B (emphasis added).  While the Texas Court did not specifically construe the term "arm", its construction of "arm assembly" is instructive and consistent with MASS's proposal that "arm" be construed to mean "an elongate structure *connected to and projecting from* another structure."

**B.  base/base member/base structure**

Consistent with their use in the specification and the claims, the terms base, base member and base structure (which the parties agree should all have the same construction and will be referred to herein collectively as "base") mean the lowermost portion of the system that engages a surface and that supports the arm assembly ('978, '103), arms ('091) or support arm structure ('331) above the surface.

Humanscale's inclusion of a "work surface" as part of its erroneous construction (a) was properly rejected by the Texas Court and (b) violates the doctrine of claim differentiation, including because certain dependent claims (e.g., claims 11, 15, 22 and 30 of the '091 patent and claim 3 of the '331 patent) further define the "surface" as a "work surface."  Humanscale's proposed construction would render these dependent claims superfluous.

Humanscale's proposed construction is also incorrect as a result of its erroneous position that a "base" must be for "resting on" a surface. The correct phraseology is that a base "engages" a surface. Humanscale's attempt to impose a "resting on" requirement on a base is an erroneous

attempt to important a non-infringement argument in to the claims by requiring that an apparatus sit "motionless… without the exertion of force." *See* Humanscale's constructions of "rest[ing] on a ... surface" and "resting on a counter" below.  However, the ordinary meaning of "base" does not require that an apparatus sit "motionless… without the exertion of force."  The patentee did not redefine "base" in any manner that would demonstrate manifest exclusion or restriction that would represent a clear disavowal of claim scope. Further, Humanscale's proposed construction requires a likely physically impossible condition.  While an object sits motionless on a surface, forces exist that are exerted on and by the object.

### C.  Each of the first computer display and the second computer display is capable of being more vertical than horizontal

Here again, Humanscale improperly attempts to impose limitations from a preferred embodiment into the claims.  Humanscale improperly includes the action of "tilting" in its proposed construction despite the fact that neither the claim language itself, nor the specification or file history, require "tilting" to occur.  To support its flawed construction, Humanscale also improperly asserts that "the '103 patent is specifically designed for use at ticket counters."  HS Op. Br. at 28.  However, the specification describes a number of uses for the invention, including that "[i]n other cases the screens may be interchangeably and releasably mountable for example in a vehicle…."  103/2:39-41. Further, no such "ticket counter" limitation is present in the plain language of the claims. Humanscale's improper attempt to limit the claims to a single embodiment and to import field of use or other limitations from that embodiment into the claims should be rejected.

While purporting to rely upon selectively quoted language from the file history wherein the Patentee distinguished his invention in certain respects over certain prior art, Humanscale invents from essentially thin air a purported requirement that the screens be

"capable of tilting." Humanscale provides absolutely no support for this restriction because there is none. As MASS describes in its Opening Brief, Humanscale's proposed construction would improperly exclude an embodiment wherein the screen was fixed in such an angled orientation because that preferred display would not be "capable of tilting." Further, nothing in the plain claim language imposes a "capable of tilting" limitation. MASS has made no statements nor taken any actions that would require limiting the plain language present in the claims.

Humanscale distorts the language used by the Patentee to distinguish certain prior art. The only purported support for Humanscale's position is the Patentee's comments to the Patent Office that "[t]hese features and limitations are not _all_ taught in either Moscovitch or Haneda, individually or in combination." HS's Op. Br. at 28 (emphasis added). The operative word in this citation is "all." Not _all_ of the features and limitations required by the claims are described in Moscovitch and Haneda. In particular, the Patentee did not state that Moscovitch and Haneda do not teach (as Humanscale erroneously argues) that "in both the first operating position and the second operating position each of the first computer display and the second computer display is capable of being more vertical than horizontal." Humanscale's position that every single limitation must be construed to distinguish over every feature of the prior is baseless. The invention as a whole is what is distinguished over the prior art.

Accordingly, as set forth in MASS's Opening Brief, the correct construction of this term is "the angle between the horizontal plane and each of the planes on which the first and second display screens lie can take on at least one value greater than 45 degrees and less than or equal to 90 degrees." Again, no "tilting" capability is required by the claim language or any applicable principles for claim construction.

5

### D.  extendable from a retracted configuration to an extended configuration

Here again, Humanscale improperly attempts to import limitations from a preferred embodiment into the claims.  Further, Humanscale misinterprets *SkinMedica* as allegedly holding that the use of the term "i.e." is definitional.  Based on this untenable interpretation of *SkinMedica*, Humanscale argues that in the claims the word "extended" should be construed narrowly as "telescoped" because the phrase "extended (i.e., telescoped)" appears elsewhere (col. 14, lines 38-42). As set forth in detail below, both the argument that the term "i.e." is definitional and the conclusion that Humanscale reaches based on its erroneous reading of *SkinMedica* are wrong.

The Patentee used the phrase "enables the upper support arm 188 to be extended (i.e., telescoped) relative to the lower support arm 186" (103/14:38-42) to state that, in a preferred embodiment, the upper support arm 188 is extended relative to the arm 186 via a telescoping action in which the neck portion 194 of arm 188 is slid out from the lower support arm 186. By using this phrase, he was not defining the word "extended" to mean "telescoped," but rather was explaining the details of one preferred telescoping method by which an arm could be extended. Humanscale's proposal that the Patentee was acting as his own lexicographer is unsupported.  To find a special definition mandated by the written description, a term must be "clearly" redefined, and an "express intent" to do so must be evident from the patent.[4]  Further, it yields non-sensical results.  For example, replacing "extends" by "telescopes" in claim 4 yields the redundant sentence "the arm that telescopes from the column is adapted to telescope."  In another example,

---

[4] *Saffran v. Johnson & Johnson*, 712 F.3d 549, 565-66 (Fed. Cir. 2013). *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("While we have held many times that a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning, the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term. Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning.")

replacing "extended" with "telescoped" in specification at col. 17, lines 41-42 results in "When *telescoped*, the centering member 514 projects outwardly of the support member 508," which seems unobjectionable until one realizes that the centering member 514 does not telescope, but instead *hinges*, as can be clearly seen in Figs. 72-75. The inescapable conclusion is that the Patentee could not have intended "extend" to mean "telescope" everywhere in the patent, and certainly not everywhere in the claims. Further, such an erroneous construction would exclude the preferred embodiments in Figs. 72-75, which, as the Federal Circuit has stated, is "rarely, if ever, correct."

Here, the phrase being construed is "extendable from a retracted configuration to an extended configuration" in the claims. However, neither "extended configuration" nor "extendable" is defined in any extraordinary or restrictive way in the specification. With no unambiguous restrictive global definition, case law instructs that this claim phrase must be given "…the full scope of its plain and ordinary meaning…" consistent with the claims and the rest of the specification. *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Claim 1 clarifies that "the distance between the one end [of the arm assembly] and the opposite end [is] greater in the extended configuration than in the retracted configuration." (limitation f.(i)). Thus, the full scope of the phrase "extendable from a retracted configuration to an extended configuration" that is also consistent with this clarification is not limited to just telescoping, as Humanscale proposes, but rather is given by MASS's definition: capable of being adjusted to increase the distance between the ends of the arm assembly.

In *SkinMedica*, the Federal Circuit upheld the district court's finding that according to the patentee, culturing cells with beads excludes culturing in three-dimensions. "The district court stated, however, that it would have found otherwise if 'the intrinsic evidence disclosed even a

single reference to culturing cells in three dimensions using beads.'" But no such disclosure was found: "In each and every one of [the] four references [that concern the use of beads], the patentees clearly distinguish culturing with beads from culturing in three-dimensions." *SkinMedica*, 727 F.3d at 1197.  In relation to the '103 patent, intrinsic evidence clearly discloses a reference to extending by using a hinging mechanism.  In the embodiment described in Figs. 71-75, an arm assembly includes arms 506 and 508.  "A centering member 512 is pivotably disposed on the support arm 508" with pivot pins 514. (col. 17, lines 24-25; emphasis added). The written description states that "[w]hen extended [by pivoting], the centering member 514 projects outwardly of the support member 508," and further states that "Fig. 74 shows the centering member 512 extended." 103/17:46-47. This is precisely a disclosure in the intrinsic evidence referencing extending via a hinge mechanism.

Humanscale's reliance on *Skinmedica* is also misplaced for reasons stated in the case itself.  For instance, where, as here, reading "i.e." definitionally would exclude embodiments such a definitional reading is improper.  *Skinmedica*, 727 F.3d 1201-2 (*citing Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012)(" The only way that the "*i.e.*" in this patent could be read definitionally is if it excluded from the claim scope the embodiments discussed throughout the claim where only a single funding source is selected. This is rarely, if ever, correct.").  Here, Humanscale's myopic construction would exclude at least the hinge mechanism (hinge 196) taught in the specification that allows the system to transform from a retracted configuration (Fig. 47) to an extended configuration (Fig. 45).

Two well established principles of claim construction illustrate the error in Humanscale's construction.  The first is applicable after noticing that there are at least two embodiments in which an arm assembly is extendable from a retracted configuration to an extended

configuration, namely, the embodiment of Figs. 45-47 that involves a hinging mechanism[5], and the embodiment of Fig. 186 that involves a telescoping mechanism.  Because Humanscale's construction excludes the former, it must be wrong because a construction "that excludes a preferred embodiment is almost always incorrect." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  The second principle (claim differentiation) may be applied in view of claim 4, which dependent claim recites that the arm assembly is adapted for telescoping. If independent claim 1, from which claim 4 depends, is to be limited to telescoping arm assemblies, as Humanscale contends, then the recitation in claim 4 is superfluous, "a methodology of claim construction that [the Federal Circuit] has denounced." *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007).  Put another way, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 414 F.3d at 1314-1315.

Further, if extending and telescoping meant the same thing, which clearly they do not, the patentee would not have needed to point out in the specification that telescoping was the method of extending in the preferred embodiment being discussed.

Finally, Humanscale's definition would lead to a contradiction.  Comparing the configuration of Fig. 44 to that of Fig. 47, which one is the extended configuration?  According to Humanscale's argument, Fig. 47 is the extended configuration because the arm assembly is telescoped, unlike in Fig. 44.  However, claim 1 specifies that "the distance between the one end [of the arm assembly] and the opposite end [is] greater in the extended configuration than in the

---

[5] Although the embodiment shown in Fig. 44 shows an arm assembly that both hinges and telescopes, telescoping is not necessary to enable system 180 to be used for one of its applications: the steps in Figs. 45-47, which exclude telescoping, demonstrate that hinging alone would allow the two LCD panels 192 to be placed at different heights for use at a ticket counter, for instance.

retracted configuration." (limitation f.(i))   Therefore, Fig. 44 is the extended configuration, which contradicts the previous conclusion.  Again, Humanscale's argument is flawed.

### E.  mounting portion

Yet again, attempting to subvert the plain claim language, Humanscale improperly attempts to limit the scope of this broad, clear term to a single, preferred embodiment.  In this case, Humanscale improperly treats the term "mounting portion" as a means-plus-function element and improperly attempts to limit this term to a single structure described as a single embodiment.  In order to justify its erroneous construction, Humanscale baselessly claims that the Patentee "acted as its own lexicographer."  HS Op. Br. at 24.  Humanscale has provided no facts or case law that supports its contention that providing an example of a preferred embodiment in the specification is tantamount to acting as a lexicographer.  As noted above, to find a special definition mandated by the written description, a term must be "clearly" redefined, and an "express intent" to do so must be evident from the patent.[6] It is well-established that a claim term must be given "…the full scope of its plain and ordinary meaning…" consistent with the claims and the specification. *Thorner,* 669 F.3d at 1365.  Here, Humanscale ignores this fundamental tenet of claim construction and attempts to limit the term "mounting portion" to a single disclosed embodiment by importing the structure from that embodiment into the claims. "[O]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319-20 (Fed. Cir. 2005) (*en banc*).

In its improper attempt to limit the scope of these terms to a single, preferred embodiment, Humanscale also fails to recognize that the claims do not use the terms "mounting member" and "mounting portion" interchangeably.  In the clear and unambiguous language and context of the claims, a mounting member is part of the support arm and a mounting portion is

---

[6] *Saffran*, 712 F.3d at 565-66 (Fed. Cir. 2013).

part of the support column.  Humanscale's proposed construction fails to make this distinction.

**F.  means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree**

Once again, Humanscale proposes a construction that improperly departs from the plain language of the claims and the context of the specification.  Here, Humanscale attempts to include structure in its construction that is not require for performing the agreed upon function for this term.  In fact, as described in MASS's Opening Brief, Humanscale is merely rehashing arguments made in the Texas Case that were rejected by the Texas Court, including when it stated: "The specification does not associate the projections and slots with performing the mounting means function. Accordingly, the projections and slots are not necessary structure." MASS's Op. Br., Ex. 5 at 11-12. Given that claims 16 and 17 recite that the mounting means comprises the means for adjusting, the Texas Court's finding implies that the means for adjusting does not have slots and projections.

There is nothing in the undisputed (in fact, agreed) function that requires the means for adjusting to *limit* the range of such adjustment to only two directions.  However, inclusion of Humanscale's proposed "slots" and "projections" would do just that.  Nothing in Humanscale's briefing explains or justifies inclusion of unnecessary. As in the Texas Case, the Court should reject the erroneous construction advanced by Humanscale.

Humanscale also argues that the projections and slots are required to restrict the displays to either horizontal or vertical movement.  However, the claims do not require such restriction. The plain language of the claims specifies that he displays be "angled toward each other to a desired degree."  The "projections and slots" structure proposed by Humanscale would prevent such movement if the user desires to angle the displays in a plane other than the vertical or horizontal.  In other words, Humanscale's construction is contrary to the plain language of the

11

claim.  Humanscale's argument that the rear of the display should not be included as part of the structure of this term contradicts the construction of the Texas Court, which correctly found that the rear of the display" should be included.  *See* MASS's Op. Br.; Ex. 5.  Simple logic dictates that if the means for adjusting is not connected to the displays, it would be incapable of adjusting the angular orientation of those displays.  Accordingly, the mean for adjusting must include some connection to the displays.  The specification of the '978 Patent makes clear that this connection is through the rear of the display.  Even Humanscale ultimately conceded that the rear of the display is connected to the ball joint.  HS Op. Br. at 13.

### G. means for adjusting the angular orientation of each of the display relative to the arm assembly about a generally vertical axis to thereby permit said displays to be angled relative to each other to a desired degree

The parties agree that this is a MPF term and that the structure for performing the stated function is the same structure as set forth for the term "means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree" in Section F. However, as set forth Section F, the parties disagree regarding that structure. MASS incorporates here its arguments set forth above in Section F.

Again, with regard to Humanscale's improper attempt in include the "projections and slots" structure, such structure would improperly restrict the scope of the claims solely to movement about a vertical or horizontal axis.  Humanscale can point to nothing in the claims or the specification that requires movement of the displays *only* about a horizontal or vertical axis.  Accordingly, Humanscale's unduly restrictive construction should be rejected.

### H. mounting means for mounting the displays to the arm assembly

The parties agree that the disclosed function, as clearly set forth in the claim, is "mounting the displays to the arm assembly." However, the parties differ, in part, as to the structure that performs the claimed function.

Both parties agree that the structure should include ball 56, shaft 58, and socket 60, ball 172, shaft 174, and socket 170. MASS further includes the rear of the display 16 and 152, which was properly included by the Texas Court after explicitly considering the merits. S*ee* MASS's Op. Br.; Ex. 6. This is also consistent with the specification which describes that the "steel ball 56 … steel shaft 58 … and a plastic socket 60 [are] *supported from the rear of display* 16." 978/3:63-66 (emphasis added). MASS also incorporates the arguments made above in Section F which further establish that the rear of the display should be included in the structure.

Humanscale provides no explanation as to why it improperly includes the structures "hole 72, pair of tabs 80, single tab 82, flat surface 190, shell 184, plate 182, screws 186/188, plug 194, socket 198 and bolt 200" in its proposed construction. None of this structure is necessary to perform the agreed function of mounting the displays to the arm assembly. Considering these structures are not clearly linked to the agreed function, that the Texas Court did not include any of this structure in its construction this term and that Humanscale has provided no explanation linking these structures to the claimed function, the Court should reject Humanscale's erroneous construction.

Humanscale further erroneously contends that, in addition to the agreed function and the parties identified structure for performing that function, this term should be further limited to "an essentially permanent connection between each display and the arm that permits the displays to be mounted in multiple different configurations." HS Op. Br. at 18-19. There are several

problems with Humanscale's erroneous construction.  First, it fails to comply with the requirements for construing a MPF claim element because, despite agreeing to the required function, Humanscale attempts to include additional functional language as part of the structure. Even if Humanscale's "essentially permanent" language was part of the function rather than structure, which it is not, Humanscale has failed to identify any structure linked to, or necessary for, performing the function of making an "essentially permanent connections [capable of] … multiple different configurations.  As a result, even assuming Humanscale's erroneous language was proper (which it is not), Humanscale has failed to identify the linked structure for performing that function.

Second, the language used by Humanscale in its proposed construction would only serve to confuse both a person of ordinary skill in the art and the jury.  For instance, how permanent does a connection have to be to qualify as "essentially permanent"?  Humanscale has provided no standard or mechanism for the Court, MASS or the jury to determine this.  Similarly, how many "different configurations" are required to meet Humanscale's purported "multiple configurations" requirement?  These examples highlight the erroneousness of Humanscale's proposed construction and underscore that such a construction would only serve to confuse a lay juror.

Finally, as previously stated, the phrase "essentially permanent" is potentially ambiguous, including without any further explanation from Humanscale.  With respect to the embodiment of Figs. 17-19, the specification teaches that after the arm 162 is rotated from horizontal to vertical, the displays can be removed from the arm to rotate them 90 degrees to revert back to a landscape orientation.  One display may also be repositioned closer to the other by engaging the socket 202 instead of the socket 204.  Clearly, then, by "essentially permanent" the Examiner could not have

14

meant that the displays can never be removed from the arm.  Yet, if this phrase is adopted, a jury member might mistakenly believe that "essentially permanent" means that the displays can never be removed.  It is improper to claim that the patentee disavowed the full scope of mounting means that he intended because of the Examiner's "essentially permanent" phrase.  As the Manual of Patent Examining Procedure clarifies, "[t]he failure of applicant to comment on the examiner's statement of reasons for allowance should not be treated as acquiescence to the examiner's statement."  Ex. 11; MPEP 1302.14, *citing Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

Humanscale argues that MASS's proposed alternative construction contains structures which MASS maintains are not – and which in fact are not – required to perform the recited function.  However, Mass's alternative construction merely mimics the construction of the Texas Court, because at least it is more correct than Humanscale's wholesale wrong construction. This Court should arrive at the correct construction of this term, which should not include structures unnecessary to perform the recited function, and which thus accords with MASS's primary construction.

## I.  mounting member

Consistent with its use in the claims and specification of the '331 Patent, a "mounting member" is a member of the support arm structure used for mounting.[7]  As set forth above in Section E, Humanscale attempts to conflate the terms "mounting member" and "mounting portion."  However, these terms have difference meanings at least because under the doctrine of claim differentiation, different claim terms are presumed to have different meanings.

In addition, Humanscale's unduly restrictive construction attempts to import limitations from a single embodiment to the exclusion of the plain meaning of the claim language and to

---

[7] In contrast, and as set forth in detail in Section E, a "mounting portion" is associated with the support column.

other disclosed embodiments. As previously described, it is a "cardinal sin" of claim construction to import limitations from the specification into the claims. *Phillips*; 415 F.3d 1303, 1319-20. Humanscale's proposed construction would exclude the configuration of mounting member 36. "It is axiomatic that a claim construction that excludes a preferred embodiment is rarely, if ever correct." *NeoMagic*, 287 F.3d at 1074.

While the terms "mounting member" and "mounting portion" have similar meanings through their use of the term "mounting," they are not (as Humanscale suggests) the same.

### J.  positioning means for positioning displays

Humanscale's arguments about "positioning means for positioning displays" completely miss the mark.   Further, Humanscale's selective reliance on inapposite quotations from the reexamination file history is baseless.

Humanscale incorrectly argues that the Texas Court in the *Ergotron* case somehow read this term out of the claims.  Nothing could be farther from the truth.  As the Texas Court found:

> The claim language recites sufficient structure.[8] The claim states "positioning means for ... comprising:" an arm assembly, "support means . . .," "mounting means. . . ," and "means for adjusting. . . ." '978 patent, Col. 11:10–12:2. Although the recited structure includes means-plus-function limitations, there is sufficient structure in the claim language such that Section 112, ¶ 6 does not apply. *British Tel. PLC v. Prodigy Commc'n Corp.*, 189 F. Supp. 2d 101, 110 (S.D.N.Y. 2002); *see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359–60 (Fed. Cir. 2004) ("we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function").

MASS Op. Br.; Ex. 5 at 6-7.  Humanscale's circular argument that the structure identified as part of the positioning means is insufficient to perform an associated function is erroneous and misleading, including because the positioning means is *not* a mean-plus-function element.

---

[8] Positioning means is used in both claim 16 and 17. This analysis applies with equal weight to both claims.

Here again, Humanscale cites inapposite portions of the reexamination file history in an attempt to justify its improper departure from the Texas Court's construction of this term. *See* HS Op. Br. at 17. Humanscale improperly cites pages that do not even mention the positioning means element. Far from supporting Humanscale's erroneous position, this shows that Humanscale has not and cannot reasonably justify the construction it has proposed.

**K.  rest[ing] on a … surface**
**L.  resting on a counter**
The terms "rest[ing] on a … surface" and "resting on a counter" have well understood, plain and ordinary meanings for a person of ordinary skill in the art as well as a lay juror. Humanscale's attempt to re-word this claim language apparently to support a non-infringement argument is unsupported.

As addressed in Section B of MASS's Opening Brief, it is non-sensical that any apparatus subject to the laws of nature can sit "motionless … without the exertion of force." Indeed, Humanscale's proposed construction requires a physically impossible condition. While an object sits motionless on a surface, forces exist that are exerted on and by the object. The surface exerts forces, which may include frictional forces, on the object, and the Earth also exerts a gravitational force on the object, including due to the mass of the arms and monitors being supported. In turn, the object exerts a net downward force on the surface. Humanscale's attempt to impose this unwarranted limitation serves only to improperly narrow the plain and ordinary meaning of this easily understood term, and it lacks any meaningful support from intrinsic evidence or any possibly relevant extrinsic evidence. Humanscale belatedly acknowledges that some force – such as the force of gravity – may be necessary, but somehow maintains that other forces (including the forces described above) should still be excluded. However, Humanscale's construction is unequivocal that there can be no exertion of force. Accordingly, as Humanscale

17

now admits, its construction cannot be correct.Finally, Humanscale argues that because the bases shown in the specifications of the patents-in-suit are designed to be placed on a surface, the claims should be limited solely to such embodiments.  However, the law is clear that "[o]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." *Phillips*, 415 F.3d at 1319-20.

For at least these reasons, including those set forth in Section B, the Court should reject Humanscale's erroneous construction of these terms and give them their plain and ordinary meaning.  However, if the Court concludes that these terms do require construction, they should be construed as "stay[ing] still on a surface" and "stay[ing] still on a counter", respectively.

### M. stand[ing] on [a/the] ... surface
Here again, Humanscale fails to recognize that the term "stand[ing] on [a/the] … surface" has a plain and ordinary meaning, in context, to a person of ordinary skill in art.  As with "rest[ing] on a … surface" and "resting on a counter," Humanscale's arguments further underscore the lack of any genuine dispute as to the meaning of this term, which can even be readily understood by a lay juror.  This term needs to construction and should be given its plain and ordinary meaning.

Humanscale contends that the construction of this term should include "without the exertion of force."  However, as noted above, Humanscale's position is unsupported and indeed physically impossible because when a base at rest is entirely on a horizontal surface, the base exerts a downward force on the surface and the surface exerts an equal (in magnitude) but opposite (in direction) force on the base.   This alone renders Humanscale's construction nonsensical and contrary to commonly understood scientific principles.

Humanscale's purported justification for its erroneous construction also improperly relies on (a) conflation of the terms "rest" and "stand" (which Humanscale argues are interchangeable

18

despite the fact that the doctrine of claim differentiation requires that they have different meanings) and (b) a single, preferred embodiment (*i.e.*, a "freestanding unit with a wide base"). Humanscale cites to no language from the claims, specification or file history that requires, much less suggests, that this term should be narrowly construed to encompass only the single embodiment described by Humanscale. *See* HS Op. Br. at 6. Rather, in accordance with well established principles of claim construction, this term should be given "the full scope of its plain and ordinary meaning" consistent with the claims and the specification. *Thorner,* 669 F.3d at 1365.

### N.  support arm structure [having a single piece support arm]

The term "support arm structure" requires no construction because (a) it has a plain and ordinary meaning and (b) the requirements and/or limitations of the support art structure are set forth in the claim language itself. No further definition or clarification of this easily understood term is necessary. As is often the case, here "[t]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Nothing further is required of a support arm structure than what the claims specify.

As with many other disputed terms, Humanscale again improperly attempts to import limitations from the specification and file history into the claims. In so doing, Humanscale erroneously conflates the terms "support arm structure" and "single piece support arm." Humanscale ignores that that plain language of the claim recites that the support arm structure includes a single piece support arm (i.e., the support arm is just a component of the support arm structure and is not synonymous with the entire support arm structure).

Humanscale's reliance on the reexamination file history to support its erroneous position is (again) misplaced. *See* HS Op. Br. at 21. Contrary to Humanscale's assertion, the examiner understood that the support arm – *not the entire support arm structure* – was a single piece. For

instance, in the final Notice of Allowance, the examiner states that "the support arm structure, *and the single piece support arm thereof*, is secured to the support column…"  Ex. 12; Notice of Allowance dated 09/12/2011 at 7.  The examiner's final position on this issue demonstrates that the support arm (which is a single piece as required by the plain language of the claim), is not the same as the support arm structure but rather only comprises a single element of the entire support arm structure.

Humanscale's entire argument for inclusion of its "preconceived radius of curvature" language is that the examiner used those words during the reexamination proceedings.  However, Humanscale fails to cite any law that suggests or requires that the Court adopt language from the examiner where, as here, such language is vague and confusing.   Indeed, Humanscale has provided no support from the specification or otherwise for how a particular radius of curvature may be "preconceived."

To the extent Humanscale argues that MASS has somehow implicitly (or explicitly) acquiesced with the patent examiner's comments regarding the nature of the support arm structure, such argument is demonstrably incorrect.   As the Manual of Patent Examining Procedure makes clear that MASS had no obligation to respond to such comments, and that , "[t]he failure of applicant to comment on the examiner's statement of reasons for allowance should <u>not</u> be treated as acquiescence to the examiner's statement."  Ex. 11; MPEP 1302.14 (emphasis added), *citing Salazar,* 414 F.3d at 1347.

**O.  support means for supporting the arm assembly from the base member**

Here again, Humanscale has simply recycled arguments that properly rejected by the Court in the Texas Case.  In addition, even setting aside that Humanscale's arguments have rightfully failed once before, the structure that Humanscale seeks to include beyond that in MASS's proposed construction is neither clearly linked to, nor necessary to perform, the

function upon which the parties' have agreed.

As before, knowing that it cannot succeed here with arguments that were rejected in the prior litigation, Humanscale grasps at straws by ignoring the context of cherry picked portions of the reexamination file history.  However, Humanscale fails to cite to the Court the portion of the reexamination file history where MASS distinguished the Reh prior art based on the claim constructions from the Texas Court:

> To see this, first note that claims 16 and 17 recite "support means for supporting the arm assembly."  Judge Davis has provided the following definitions.
>
> arm assembly: a structure having one or more constituent parts connected to and projecting from the support means
>
> support means: upright 20, circular recess 34, washer 36, and bolt 38 (figure 7)
>   OR
> upright 158, socket 206, plug 208, and bolt 210 (Figure 19)

HS Op. Br., Ex. B-18 at 11.

MASS now seeks the same correct construction set forth by the Texas Court and that MASS identified to the Patent Office during reexamination.  Humanscale cannot rely on select portions of the prosecution history to the exclusion of others.  A disclaimer of claim scope must be "clear and unambiguous."

Furhter, the improper language that Humanscale attempts to add related to "a structure having one upright" is superfluous and will only serve to confuse the jury because the structure identified by the Texas Court, by MASS *and by Humanscale*, all already require an upright (i.e., upright 20; upright 105; and upright 158). The extra structures listed by Humanscale are either related to the rotary joint function or, at a minimum, simply not necessary for supporting the arm

21

assembly. As such, they should not be included in the Court's construction.

**P. support means having a base for supporting the arm assembly above a support surface**

The parties are in agreement as to the function of this term and also agree that the structure for this term should be the same as that set forth by the parties for "support means for supporting the arm assembly from the base member" (*see* Section O), except that the base should also be included. Humanscale proposes to specifically identify the base by number (i.e., "12/156"); however, such identification is not necessary including because "base" has already been construed in Section B, above.

With regard to the additional structure that Humanscale improperly attempts to include, MASS incorporates here its objections from Section O, above.

**Q. support surface**

Consistent with the claims, the specification and the file history of the '978 Patent, the term "support surface" should be given its plain and ordinary meaning of "surface that supports the base." This construction is also identical to the term's prior construction in the Texas Case. There, the Texas court construed support surface as a "surface that supports the base." MASS's Op. Br.; Ex. 7; App. B. Here, there is no reason to depart from the Texas Court's well-reasoned construction.

Humanscale's proposed construction is improperly narrow. Where the patentee chose to require that the base "stand" on a surface, he specifically included the word "stand." For instance, both claims 29 and 37 require that the base be "configured to stand" on the horizontal or support surface. Inclusion of the word "stand" in the construction of "support surface" is not only improperly narrow but it is also redundant because the claim language itself specifies when the base must "stand" on a surface.

Humanscale's argument that its proposed construction is taken directly from the Texas

Court's order is misleading.  The Texas Court's construction of support surface was "a surface that supports the base."  Humanscale's attempt to suggest that its proposed construction is the same as – or even consistent with – the Texas Court's construction is demonstrably false.

### R.  the ends are oriented vertically

The term "the ends are oriented vertically" has a plain and ordinary meaning, including to a person of ordinary skill in the art as well as to a lay juror. The use of this term throughout the '103 patent is consistent. The patentee of the '103 Patent did not redefine this term in any manner that would demonstrate manifest exclusion or restriction and that would represent a clear disavowal of any claim scope. Accordingly, the term "the ends are oriented vertically" should be interpreted in light of its plain and ordinary meaning to one skilled in the art.[9]

In a leap of unexplained logic, Humanscale attempts to convince the Court that "end" does not mean "end," but rather means "arm."  Humanscale has erroneously proposed that the "ends [of the arm]" should somehow be construed to mean the entire arm assembly (*i.e.*, "the arm assembly is oriented vertically").  Humanscale's selective reliance on the file history to bolster its flawed construction is misplaced.  For instance, Humanscale argues that since the specification describes in one embodiment that an arm is capable of being placed in a "vertically stacked orientation," this must mean that the "ends" must include the entire arm assembly.  Humanscale Op. Br. at 29-30.  This is non-sensical on its face.  Where the patentee wanted to describe an "arm assembly," he did so.  *See, e.g.*, claims 1, 3, 7, 9, 10, 12, 15 and 16. Had the patentee wanted to indicate that the arm assembly must be oriented

---

[9] *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

vertically, he also could have done so.  However, he chose to specifically require only the *ends* of the arm assembly to be oriented vertically.  A disavowal of claim scope must be clear and unambiguous.  Humanscale cannot cite select, inapposite portions of the specification in an attempt to read improper limitations into the claims or to improperly attempt to redefine the plain, unambiguous language of the claims.

## IV.    CONCLUSION

For at least the foregoing reasons, MASS's proposed constructions should be adopted, including adopting the plain and ordinary meaning of terms when appropriate, and Humanscale's proposed constructions should be rejected.

/s/ F. Elizabeth Burgin Waller

F. Elizabeth Burgin Waller
(VSB No. 74726)
WOODS ROGERS PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia  24038-4125
540-983-7625; Fax 540-983-7711
bburgin@woodsrogers.com

John J. Edmonds (*pro hac vice*)
jedmonds@cepiplaw.com
Stephen F. Schlather (*pro hac vice*)
sschlather@cepiplaw.com
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: 713-364-2371
Facsimile: 832-415-2535

ATTORNEYS FOR DEFENDANTS MASS
ENGINEERED DESIGN INC. AND
JERRY MOSCOVITCH

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2013, I electronically filed the foregoing DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF via the Court's CM/ECF System, which will send notification of this filing to the following:

Frederic M. Meeker
Christopher Roth
BANNER & WITCOFF LTD. (DC)
1100 13th Street NW, Suite 1200
Washington, DC 20005-4051
fmeeker@bannerwitcoff.com

Jason Charkow
WINSTON & STRAWN, LLP
200 Park Avenue
New York, New York 10166
jcharkow@winston.com

Adam Roger Steinert
Kurt Niederluecke
FREDRIKSON & BYRON P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
asteinert@fredlaw.com
kniederluecke@fredlaw.com

DATE: October 22, 2013

*/s/ F. Elizabeth Burgin Waller*
F. Elizabeth Burgin Waller

ATTORNEYS FOR DEFENDANTS MASS ENGINEERED DESIGN, INC. AND JERRY MOSCOVITCH

25